**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

GARY A. HOPPER,

                                                Plaintiff,

              - v -                                                                         No. 06-CV-038
                                                                                                    (LEK/DRH)

COMMISSIONER OF SOCIAL SECURITY,

                                                Defendant.

**APPEARANCES:**                                                 **OF COUNSEL:**

CONBOY, McKAY, BACHMAN &                     LAWRENCE D. HASSELER, ESQ.
     KENDALL, LLP
Attorney for Plaintiff
307 State Street
Carthage, New York 13619

HON. GLENN T. SUDDABY                              WILLIAM H. PEASE, ESQ.
United States Attorney for the                       Assistant United States Attorney
     Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**United States Magistrate Judge**

### REPORT-RECOMMENDATION and ORDER[1]

        Plaintiff Gary A. Hopper ("Hopper" or "Plaintiff") brought this action pursuant to 42

U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner") denying his application for benefits under the Social Security Act.

Hopper moves for a finding of disability and the Commissioner cross-moves for a

judgment on the pleadings.  Docket Nos. 6, 10.  For the reasons which follow, it is

_____

        [1]The matter was referred to the undersigned for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

recommended that the Commissioner's decision be remanded for further proceedings.

## I. Procedural History

On May 20, 2004, Hopper filed for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. § 401 et seq.  T. 49-51.[2]  The application was initially denied.  T. 26.  Hopper requested a hearing before an administrative law judge ("ALJ"), which was held before ALJ Michael Brounoff on February 9, 2005.  T. 31-32, 213-54.  In a decision dated July 22, 2005, the ALJ held that Hopper was not entitled to disability benefits.  T. 14-23.  Hopper filed a request for review with the Appeals Council.  T. 9-10.  On December 1, 2005, the Appeals Council denied Hopper's request, thus making the ALJ's findings the final decision of the Commissioner.  T. 5-8.  This action followed.

## II. Contentions

Hopper contends that the ALJ erred when he failed to apply the treating physician's rule properly, determine his residual functional capacity (RFC), and evaluate his subjective complaints of pain.  The Commissioner contends that there was substantial evidence to support the determination that Hopper was not disabled.

## III. Facts

Hopper is currently fifty-seven years old[3] and has a high school education.  T. 49-

---

[2] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  Docket No. 5.

[3] At the time of the ALJ's decision, Hopper was fifty-three years old.  T. 15.

50, 61.  Hopper previously worked as a production truck driver, hoistman, and trammer[4] in

the mining industry.  T. 15, 55, 57, 66-71.  Hopper alleges that he became disabled on

November 13, 2003 due to a herniated disc in the C6-7 region.  T. 49, 54, 57.

## IV.  Standard of Review

### A.  Disability Criteria

A claimant seeking disability benefits must establish that "he [or she] is unable to

engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§

423(d)(1)(A) & 1382c(a)(3)(A) (2003).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he
> [or she] is not only unable to do his [or her] previous work but cannot,
> considering his [or her] age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which he [or
> she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] w

*Id.* at §§ 423(d)(2)(A) & 1382c(a)(3)(B) (2003).

The Commissioner uses a five step process, set forth in 20 C.F.R. §§ 404.1520 &

416.920, to evaluate disability insurance benefits and SSI claims:

> First, the [Commissioner] considers whether the claimant is currently engaged
> in substantial gainful activity.  If he [or she] is not, the [Commissioner] next
> considers whether the claimant has a "severe impairment" which significantly
> limits his [or her] physical or mental ability to do basic work activities.  If the
> claimant suffers such an impairment, the third inquiry is whether, based solely
> on medical evidence, the claimant has an impairment which is listed in

---

[4]A trammer operates a car used in mines to haul loose rock and debris.  <u>Moon-
Anchor Consol. Gold Mines v. Hopkins</u>, 111 F. 298, 299 (8th cir. 1901).

Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.  Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); see 20 C.F.R. §§ 404.1520 & 416.920 (2003).

A plaintiff has the burden of establishing disability at the first four steps.  Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).  However, if the plaintiff establishes that an impairment prevents him or her from performing past work, the burden then shifts to the Commissioner to determine if there is other work which the claimant could perform.  Id.

### B.  Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Shaw, 221 F.3d at 131 (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000).

"In addition, an ALJ must set forth the crucial factors justifying his findings with

-4-

sufficient specificity to allow a court to determine whether substantial evidence supports

the decision." Prentice v. Apfel, No. 96 Civ. 851(RSP), 1998 WL 166849, at *3 (N.D.N.Y.

Apr. 8, 1998) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  A court,

however, cannot substitute its interpretation of the administrative record for that of the

Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v.

Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by

substantial evidence, it is conclusive.  Bush v. Shalala, 94 F.3d 40, 45 (2d Cir. 1996).

## V.  Discussion

### A.  Medical Evidence

On November 3, 2003, Plaintiff complained to Dr. Kenneth Fish about discomfort in

the trapezius muscle of his left shoulder.[5]  T. 116.  Dr. Fish noted that tenderness under

the arm was subjectively reported and that with extension of the neck, there was increased

burning and discomfort in the left trapezius area.  T. 117.  However, he found that Hopper

was neurovascularly intact, pulses were normal, and he had good motor strength.  Id.  Dr.

Fish noted that Hopper was overweight at 260 pounds.  T. 116.   On November 12, 2003,

Hopper reported to Dr. Fish that he had increased pain in his neck and back.  T. 118.  Dr.

Fish found that Hopper's reflexes were normal, motor was equal bilaterally, although he

was hesitant to move because of discomfort, he was neurovascularly intact, and there was

---

[5]Hopper additionally suffered from the following conditions that were diagnosed prior to November 2003:  renal insufficiency, hearing loss, urinary obstruction, acid reflux, hypertension, sleep apnea, and allergies.  See T. 99-115, 146-150, 176-87, 192-97, 212. However, Hopper testified that none of these conditions affected his ability to work nor did they cause his alleged disability.  T. 240-43.

no muscle atrophy.  Id.  Dr. Fish also opined that there was accentuated kyphosis[6] of

Hopper's neck and mild lordosis[7] of the upper thoracic spine.  Id.  Hopper was prescribed

Flexeril.  Id.  On November 24, 2003, Dr. Fish noted that Hopper's C-spine x-ray revealed

degenerative discs at C5, 6, and 7.  T. 119, 125.  He also found that Hopper had

pronounced cervical lordosis, cramping in his neck, and pain down his arm.  Id.  However,

Dr. Fish stated that Hopper was able to relieve the discomfort in flexion and that motor

strength and reflexes were normal.  Id.

On December 4, 2003, by referral from Dr. Fish, Dr. John Krawchenko examined

Hopper.  T. 128-29.  Dr. Krawchenko stated that Hopper had mild discomfort from neck

pain; there was tenderness over the left parascapular muscle and cervical spine, the left

more than the right, with neck muscle spasm; the range of motion in his neck was limited;

and there was slight weakness in the left arm.  T. 128.  He found, however, that the right

arm, leg strength, and gait and balance were normal and there was no spasticity or

myelopathy.[8]  Id.  He opined that Hopper was totally incapacitated and disabled and

should restrict his activities.  T. 130.  On December 8, 2003, Dr. Fish reported that Hopper

suffered from a large paramedian left foraminal disc herniation at C6–7 with impingement

of the left C7 nerve root and fecal sac in the anterior lateral aspect of the spinal cord on

the left side.  T. 120, 126-27.  Upon examination, Dr. Fish found that Hopper was

---

[6]An abnormality in the curvature of the spine.  Dorland's Illustrated Med. Dictionary 890 (28th ed. 1994) [hereinafter "Dorland's"].

[7]Abnormally curved spine.  Dorland's 960.

[8]{A] general term denoting functional disturbances and/or pathological changes in the spinal cord . . . ."  Dorland's 1090.

neurovascularly intact, motor was equal in the lower and upper extremities, there was

subjective numbness on the index finger of the left hand, flexion and extension of his

wrists were normal, and gait was unremarkable.  Id.  Surgical options and alternatives

were discussed.  Id.  On December 19, 2003, Dr. Neil H. Inhaber noted Hopper's

herniated disc and neck pain but did not indicate any abnormal findings.  T. 165-67.

On January 8, 2004, Dr. Fish, noting that Hopper's examination was for workers'

compensation, stated that there was evidence of disc herniation with compression at C6-7.

T. 121.  He stated that surgery was not recommended as physical therapy was helping

with the pain and aching.  Id.  Dr. Fish reported that although Hopper stated that he felt

weakness in his left arm, he had excellent motor tone and resistance against pulling down

of his elbows and that there was nothing grossly abnormal.  Id.  He further stated that

range of motion of the arms, motor, and deep tendon reflexes were all normal and that

hand and wrist strength along with flexors and extensors of the wrists were normal.  Id.[9]

On January 20, 2004, Dr. Krawchenko stated that Hopper had improved but that Hopper

continued to have weakness in his left arm and grip strength was 4/5.  T. 132.  He

reported that there was no spasticity or myelopathy and gait and balance were normal.  Id.

Dr. Krawchenko noted that Hopper declined any surgical intervention, that therapy should

be continued, and that he was unsure if Hopper could ever return to work due to the heavy

duty nature of the work.  Id.

On February 6, 2004, Dr. Fish found that Hopper's range of motion of his neck was

normal, there was no motor weakness or sensory deficits, and deep tendon reflexes were

---

[9]During the same examination, it was noted that Hopper weighed 267 pounds. T.
121.

equal bilaterally in the upper extremities.  T. 122.  Hopper also reported that he had

significant improvement with physical therapy, no motor weakness, and no numbness or

tingling.  Id.  Dr. Fish then noted that Hopper's weight was 271 pounds.  Id.  On March 9,

2004, Dr. Krawchenko stated that Hopper was slowly improving but that he was weak on

his left side and dropping objects that weighed more than five pounds.  T. 134.  Dr.

Krawchenko noted that therapy was helping, Hopper still refused surgery and Dr.

Krawchenko recommended that Hopper go to a VESID[10] retraining program for different

occupations that could accommodate his condition.  Id.[11]  On June 15, 2004, Dr. Fish

stated that Hopper was overweight at 269 pounds, he was in no acute distress, his neck

was symmetric and supple, there was no clubbing, cyanosis, or edema of his extremities,

and his peripheral pulses were equal bilaterally.  T. 151-52.

On July 28, 2004, Hopper was examined by Dr. David Tiersten, a state agency

medical consultant.  T. 136-39.  Dr. Tiersten noted that Hopper could cook, clean, do

laundry, shop, shower, bathe, and dress himself.  T. 137.  Upon physical examination, he

stated that Hopper weighed 211 pounds and found that his gait and station were normal,

he could heel-and-toe walk without difficulty, his squat was full, he needed no help

changing or getting on and off the examination table, and he could rise from his chair

without difficulty.  Id.  Dr. Tiersten reported that Hopper had full flexion, extension, and

rotary movements bilaterally of his cervical spine, although lateral flexion was limited; full

---

[10]Vocational Educational Services to Individuals with Disabilities, a component of the New York State Department of Education, which, inter alia, provided job retraining programs.

[11]In an examination a few day later, Dr. Fish noted that Hopper was overweight.  T. 123.

flexion, extension, lateral flexion, and rotary movements bilaterally of his lumbar spine; and full range of motion of his shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally  T. 138.  He further stated that Hopper had 5/5 strength in his upper and lower extremities; his joints were stable and nontender; there was no effusion, sublaxations, or contractures; he had no muscle atrophy; hand and finger dexterity was intact; and his grip strength was 5/5 bilaterally.  Id.  Dr. Tiersten concluded that Hopper's prognosis was guarded and that he was unable to do more than moderately prolonged standing, walking, carrying, or lifting.  Id.

On August 24, 2004, Dr. Kevin Scott conducted an independent orthopedic examination for Hopper's workers' compensation case.  T. 189-90.  He noted that in a previous examination, he found that Hopper had a C6-7 herniated nuclear pulposus and recommended physical therapy, which Hopper stated he was unable to complete because he did not have enough money for gasoline.  T. 189.  Dr. Scott found that Hopper had a positive Spurling maneuver to the left upper extremity but that he had good reflexes in his left upper extremity with weakness on the left as compared to the right.  Id.  He opined that Hopper needed physical therapy and concluded that he had a marked partial disability.  Id.

On September 3, 2004, Hopper was evaluated by a state agency disability analyst,[12] who concluded that Hopper could lift up to ten pounds frequently and twenty pounds occasionally, sit for six hours in an eight-hour day, stand and walk for six hours in an eight-hour day, and occasionally perform postural activities.  T. 141-42.  It was further noted that Hopper should avoid concentrated exposure to vibration.  T. 143.  On

---

[12]The name of the consultant is indecipherable.  See T. 145.

September 15, 2004, Dr. Krawchenko noted that Hopper continued to have weakness in his left arm, tenderness over the cervical spine and paraspinal muscles, and limited range of motion in his neck.  T. 135.  He stated that Hopper should exercise but restrict his activities, he should not lift more than two to five pounds, and he should avoid prolonged bending or turning his neck.  Id.  Dr. Krawchenko opined that Hopper was totally disabled, most likely permanently, and further noted that Hopper had declined any surgical intervention.  Id.  On October 1, 2004, Dr. Fish stated that Hopper was overweight at 277 pounds and found that he was in no acute distress; his neck was symmetric and supple; there was no clubbing, skin discoloration, or edema of his extremities; and his peripheral pulses were equal bilaterally.[13]  T. 153-54.  The same day, Dr. Fish also ordered an x-ray of Hopper's lumbar spine, which revealed mild narrowing of the L1-2 and L5-S1 discs, indicating mild degenerative disc disease, as well as mild osteoarthritic changes in the posterior facets at L4, L5, and S1 bilaterally.  T. 157.

On February 1, 2005, Dr. Krawchenko examined Hopper and found that his neck was non-tender, range of motion was limited, and there was good strength and tone.  T. 161.  He also reported that Hopper's back was non-tender, range of motion was painless, there was no vertebral point tenderness, grip strength on the right was 5/5 and 4/5 on the left, and gait was normal.  Id.  On February 3, 2005, Dr. Fish found tenderness in the paravertebral spaces on both sides of the lower back and mildly increased lordosis in the lumbar area.  T. 208.  Nevertheless, he reported that Hopper was able to bend over a few inches from touching his toes; side-bending, rotation, and extension were normal; he was

---

[13]The same findings were made in an October 28, 2004 examination by Dr. Fish.  T. 155-56.

neurovascularly intact; and there was no muscle atrophy.  Id.  Lower back exercises as well as medications were recommended.  Id.  It was also noted that Hopper was markedly overweight.  Id.  On February 8, 2005, Dr. Fish stated that Hopper had tenderness in the paravertebral spaces bilateral to the lower back and mildly increased lordosis in the lumbar area with bilateral paravertebral tenderness.  T. 191.  However, he noted that side-bending, rotation, and extension were all normal; he was neurovascularly intact; and there was no evidence of muscle atrophy.  Id.  He further noted that Hopper was taking Lortab, Flexeril, Prevacid, Lotensin, and Flomax for his ailments and that he was markedly overweight.  Id.

On April 12, 2005, Dr. Scott conducted another independent orthopedic examination.  T. 198-99.  He reported that Hopper was able to do home therapy but Hopper expressed continued complaints of left arm pain.  T. 198.  Dr. Scott found that Hopper had positive Spurling maneuver to the left side, 4/5 muscle strength on the left, and paraspinous muscle tenderness on the left, although range of motion of the cervical spine was improved.  Id.  He concluded that because Hopper refused surgery, he did not feel that Hopper would improve and according to the workers' compensation guidelines, he would classify Hopper as having a marked permanent degree of disability.  T. 198-99.  On April 18, 2005, Dr. Krawchenko examined Hopper and found that his neck was non-tender to palpation; there was painless range of motion, although it was limited; and he had good strength and tone.  T. 206.  He also stated that there was no lumbar vertebral point tenderness or muscle spasms, gait was normal, and strength on the right was 5/5 but 4+/5 on the left with left bicep and deltoid strength at 5/5.  Id.  It was recommended that Hopper continue his medications and stretching exercises.  Id.

On August 8, 2005, Dr. Krawchenko completed a medical source statement regarding Hopper's ability to do work-related activities.[14]  T. 201-04.  It was concluded that Hopper could lift less than ten pounds frequently and up to ten pounds occasionally; stand and walk for two hours in an eight-hour day, although not continuously; he had to alternate between sitting and standing; he was limited in his upper extremities in his ability to push and pull; and he could occasionally perform postural activities.  T. 201-02.  It was also noted that Hopper was occasionally limited in his ability to reach, handle, finger, and feel and that he should limit his exposure to humidity and wetness as well as hazards.  T. 203-04.  It was further opined that Hopper's pain was present to an extent that it would distract from adequate performance of daily activities or work, physical activity would greatly increase pain causing abandonment of tasks related to daily activities or work, and that his medications would severely limit Hopper's effectiveness in the work place.  T. 205.

## B.  Treating Physician's Rule

Hopper contends that the ALJ erred when he gave substantial weight to Dr. Tiersten, a one-time consultative examiner; discredited the opinion of Dr. Krawchenko, his treating physician; failed to mention or assign weight to the opinion of Dr. Fish; and improperly accorded weight to the opinions of Dr. Scott and the disability analyst.  The Commissioner contends that the ALJ properly applied the treating physician's rule.

When evaluating a claim seeking disability benefits, factors to be considered

---

[14]The August 2005 assessment by Dr. Krawchenko was presented to the Appeals Council as new evidence and was not in the possession of the ALJ at the time his decision was rendered.  See T. 5-8.

include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant.  Harris v. R.R. Ret. Bd., 948 F.2d 123, 126 (2d Cir. 1991).  Generally, more weight is given to a treating source.  Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2) (2005); Shaw, 221 F.3d at 134.  Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons."  Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  Schaal, 134 F.3d at 503.  If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given.  Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).  Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner.  Id. at 133-34; see 20 C.F.R. § 404.1527(e) (2005).

### 1.  Dr. Tiersten

Dr. Tiersten, a state agency consultant, examined Hopper on only one occasion.  T. 136-39.  As previously discussed, Dr. Tiersten noted that Hopper could cook, clean, do laundry, shop, shower, bathe, and dress himself.  T. 137.  This was confirmed by Hopper's

own testimony.  See T. 225, 231, 237-40.  During the physical examination, Dr. Tiersten reported that Hopper's gait and station were normal, he could heel-and-toe walk without difficulty, his squat was full, he needed no help changing or getting on and off the examination table, and he could rise from his chair without difficulty.  T. 137  He also found that Hopper had full flexion, extension, and rotary movements bilaterally of his cervical spine, although lateral flexion was limited; full flexion, extension, lateral flexion, and rotary movements bilaterally of his lumbar spine; and full range of motion of his shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally  T. 138.  He further stated that Hopper had 5/5 strength in his upper and lower extremities; his joints were stable and nontender; there was no effusion, sublaxations, or contractures; he had no muscle atrophy; hand and finger dexterity was intact; and his grip strength was 5/5 bilaterally.  Id.  Dr. Tiersten diagnosed Hopper with a cervical and lumbrosacral strain/sprain, hypertension, sleep apnea, and a history of renal cell carinoma.  Id.  Dr. Tiersten opined that Hopper's prognosis was guarded and that Hopper was unable to do more than moderately prolonged standing, walking, carrying, and lifting.  Id.

      Dr. Tiersten's diagnosis of cervical and lumbrosacral strain/sprain may well have been erroneous as Hopper had previously been diagnosed with disc herniation with compression at C6-7.  The ALJ did not address the diagnosis, however, but discussed the findings and conclusion.  Notwithstanding, Dr. Tiersten's findings and conclusions were supported by substantial evidence in the record from Hopper's treating physicians, Drs. Fish and Krawchenko.  See T. 117-22, 128, 132, 151-56, 161, 165-67, 191, 206, 208.  Therefore, it was appropriate for the ALJ to give Dr. tiersten's opinion substantial weight even though Dr. Tiersten only examined Hopper on one occasion.  See 20 C.F.R. §

404.1527(f).

## 2. Dr. Krawchenko

Dr. Krawchenko began treating Hopper in December 2003 and continued until April 2005.  On December 4, 2003, Dr. Krawchenko first opined that Hopper was totally disabled and that he should restrict his activities.  T. 130.  On January 20, 2004, he stated that he was unsure of whether Hopper would ever return to work due to the demanding nature of his past work.  T. 132.  On September 15, 2004, Dr. Krawchenko stated that Hopper should exercise but restrict his activities, he should lift no more than two to five pounds, and he should avoid prolonged bending or turning his neck.  T. 135.  Dr. Krawchenko concluded that Hopper was totally disabled and most likely permanently.

The ALJ failed to accord any significant weight to Dr. Krawchenko's assessments because he concluded that the clinical findings demonstrated that Hopper had only mild pain and slight left upper extremity weakness.  T. 18.  The ALJ also stated that Hopper's testimony regarding his activity level contradicted the assessment of total disability.  Id. The ALJ further held that the decision whether Hopper was disabled was reserved to the Commissioner and not Dr. Krawchenko.

Based on the evidence in the record, substantial evidence supports the ALJ's conclusion.  Much of Dr. Krawchenko's own findings counter his conclusions.  See T. 128, 132, 161, 206.  He even stated that Hopper should attend a VESID retraining program to find different occupations that could accommodate his condition.  T. 134.  Further, Dr. Krawchenko's conclusions were contradicted by the findings rendered by Drs. Fish and Tiersten.  See T. 117-22, 137-38, 151-56, 191, 208.  Moreover, Hopper's testimony

*-15-*

directly conflicts with Dr. Krawchenko's opinion.  Hopper testified that he could perform daily functions such as driving, shopping for groceries, cooking, cleaning, doing the laundry, and doing dishes.  T. 225, 231, 237-40.  He also stated that he could ride a lawn mower, take care of his personal needs, watch television for six hours a day, read for a half-hour to a few hours a day, lift ten pounds, bend over, reach overhead, use his hands and arms to push and pull, climb a flight of stairs, tie his shoes, and operate snaps and safety pins.  T. 231-32, 237-40.  Hopper further testified that he played nine holes of golf every week, purchased an annual golf membership, and he would either walk or use a cart on the golf course.  T. 235-37.

As discussed above, a treating physician's opinion is given substantial weight if it is supported by medical evidence.  Here, the record does not contain significant medical evidence supporting Dr. Krawchenko's opinion and does contain significant evidence opposing the opinion.  There was, therefore, substantial evidence in the record supporting the ALJ's assessment of Dr. Krawchenko's conclusions.  Moreover, the ALJ did not err in making the statement that the determination of disability was a decision left to the Commissioner.  Snell, 177 F.3d at 134; 20 C.F.R. § 404.1527(e).

### 3.  Dr. Fish

Dr. Fish began treating Hopper in July 2001 and continued to treat him until April 2005.  Over the years, Dr. Fish made many findings, but he never provided any opinions regarding Hopper's ability to do work-related activities nor his level of disability.  Although an ALJ must articulate the weight to be given to a treating physician's conclusions, the ALJ did not err in failing to discuss what weight should be given to Dr. Fish's findings as none

of those findings described Hopper's limitations.  See Caserto v. Barnhart, 309 F. Supp. 2d 435, 444-45 (E.D.N.Y. 2004).

### 4.  Dr. Scott and the Disability Analyst

Hopper asserts that the ALJ failed to give Dr. Scott's findings and conclusions controlling weight.  He also claims that the ALJ did not acknowledge Dr. Scott's adverse interests as he was retained by an insurance company.  Hopper further states that the ALJ improperly accorded weight to the opinion of the disability analyst.

Dr. Scott conducted independent orthopedic examinations on two occasions for Hopper's workers' compensation claim.  See T. 189-90, 198-99.  During these examinations, Dr. Scott found that Hopper suffered from C6-7 herniated nuclear pulposus, he had a positive Spurling maneuver to the left upper extremity but that he had good reflexes in his left upper extremity with a little weakness on the left as compared to the right, and that range of motion of the cervical spine was improved.  See id.  These findings are corroborated by substantial evidence in the record from examinations conducted by Drs. Fish, Krawchenko, and Tiersten.  See T. 116-22, 125-28, 132, 134-35, 137-38, 151-56, 161, 191, 206, 208.  Therefore, the ALJ did not err in giving the opinions some weight. T. 18-19.

However, Hooper alleges that the ALJ failed to acknowledge that Dr. Scott was hired by an insurance company with adverse interests to him and that the ALJ should not have disregarded Dr. Scott's conclusion that Hopper had a marked permanent degree of disability.  See T. 189, 199.  Although the ALJ did not specifically state that Dr. Scott was conducting his examinations for the purpose of Hopper's workers' compensation claim, he

nonetheless took into account that fact when he found that Dr. Scott's conclusions could not be given controlling weight because they were "not based on the standards set out under the Social Security Act[.]"  T. 19.  The ALJ did not err in this regard as the standards under the Social Security Act differ significantly from those applicable under various workers' compensation laws.  Crowe v. Comm'r of Soc. Sec., No. 01-CV-1579(GLS), 2004 WL 1689758, at *3 (N.D.N.Y. July 20, 2004) (citing Gray v. Chater, 903 F. Supp. 293, 301 n.8 (N.D.N.Y. 1995) ("Workers' compensation determinators are directed to the workers' prior employment and measure the ability to perform that employment rather than using the definition of disability in the Social Security Act.")).  Accordingly, the ALJ did acknowledge that the examinations were for Hopper's workers' compensation claim and properly determined that the conclusions did not deserve controlling weight.[15]

In regards to the disability analyst, the ALJ stated that the RFC assessment was not ignored but that because the analyst was not a reviewing physician or other consultant, the assessment was not a medical source opinion entitled to any weight.  T. 18.  The ALJ did not err in making this finding as a disability analyst is not considered to be an

---

[15]The ALJ additionally stated that Dr. Scott's conclusion that Hopper had a marked permanent degree of disability was not entitled to controlling weight because it is a decision reserved for the Commissioner.  T. 19.  The ALJ did not err in making this statement.  Snell, 177 F.3d at 134; 20 C.F.R. § 404.1527(e).  The ALJ also made the same ruling in regards to the opinion of a urologist, Dr. Harvey A. Sauer, who stated in Hopper's medical history that Hopper was totally disabled due to a persistent cervical spine injury.  T. 18, 193.  As with Dr. Scott, the ALJ properly determined that the conclusion of disability was left to the Commissioner, especially in light of the fact that Hopper was never treated by Dr. Sauer for any other ailment apart from his renal insufficiency and urinary condition.  See supra n. 4.

acceptable medical source under the Regulations.[16]  See 20 C.F.R. § 404.1513(a).

Accordingly, it is recommended that the Commissioner's finding in this regard be affirmed.

## C.  RFC

Hopper alleges that the ALJ's RFC assessment was not supported by substantial evidence in the record.  Specifically, Hopper contends that the ALJ erroneously relied on a disability analyst's assessment, which was accorded no weight, and failed to obtain a treating physician's medical source statement that included a detailed function-by-function assessment.

RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms.  Martone v. Apfel, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999); see 20 C.F.R.  § 404.1545 (2005).  "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." Smith v. Apfel, 69 F. Supp. 2d 370, 378 (N.D.N.Y. 1999) (citation omitted).  In assessing RFC, the ALJ must make findings specifying what functions the claimant is capable of performing, not simply making conclusory statements regarding a claimant's capabilities. Martone, 70 F. Supp. 2d at 150.  RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy.  New York v. Sullivan, 906

---

[16]Hopper further alleges that although the assessment was given no weight, it was nevertheless improperly used to make an RFC determination.  However, this argument is throughly discussed in Hopper's challenge to his RFC determination.  See subsection C infra.

F.2d 910, 913 (2d Cir. 1990); see 20 C.F.R. § 404.1545 (2005).

Here, in evaluating Hopper's RFC, the ALJ stated that Hopper

> retain[ed] the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8-hour workday, sit 6 hours in an 8-hour workday and push and/or pull 20 pounds occasionally and 10 pounds frequently.  He cannot drive on rough terrain, perform jobs requiring sensitive hearing, and must avoid concentrated exposure to vibrations.

T. 19-20.  Accordingly, the ALJ opined that Hopper could perform substantially all of the requirements of light work.[17]  T. 20-21.  In reaching this conclusion, the ALJ stated that he considered Dr. Tiersten's opinion, Hopper's testimony regarding his wide range of activities of daily living, and the "lack of severe clinical findings" that accompanied the results showing a C6-7 herniated nucleus polposus.  T. 19.  Notwithstanding, the ALJ made several errors in determining Hopper's RFC.

At the time of the ALJ's decision, the only medical evidence in the record that described Hopper's ability to do work-related activities came from the disability analyst, who never examined Hopper.  The ALJ gave no weight to that assessment.  Nevertheless, the ALJ's RFC determination is virtually identical to the findings made by the disability

---

[17] Light work involves:

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

analyst.  As stated previously, the analyst concluded that Hopper could lift up to ten

pounds frequently and twenty pounds occasionally, sit for six hours in an eight-hour day,

stand and walk for six hours in an eight-hour day, and occasionally perform postural

activities.  T. 141-42.  The analyst also stated that Hopper should avoid concentrated

exposure to vibration.  T. 143.

    Even though the ALJ claimed to utilize Dr. Tiersten's opinion in conjunction with

Hopper's testimony, he did not further elaborate on how he decided Hopper's RFC.  This

was in error.  See Hogan v. Astrue, 491 F. Supp. 2d 347, 354 (W.D.N.Y. 2007) (citing

S.S.R. 96-8p, 1996 WL  WL 374184, at *7, Titles II and XVI:  Assessing Residual

Functional Capacity in Initial Claims (S.S.A. 1996)) (further citations omitted).  In any

event, Dr. Tiersten's conclusion that Hopper was unable to perform more than moderately

prolonged standing, walking, carrying, and lifting was not made with any specificity and

Hopper could not render his own RFC assessment.

    Without the analyst's RFC assessment, the ALJ acknowledged that "[t]he record

does not contain a treating physician's medical source statement including a detailed

function by function assessment of the claimant's residual functional capacity for basic

walking, sitting, and standing."  T. 19.  As such, given the remedial intent of the Social

Security statute and the non-adversarial nature of benefits proceedings, the ALJ had an

affirmative duty, even if the claimant was represented by counsel, to develop the medical

record if it was incomplete.  Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); 20 C.F.R. §

404.1512(d) ("Before we make a determination that you are not disabled, we will develop

your complete medical history for at least the 12 months preceding the month in which you

file your application . . . .").  In furtherance of the duty to develop the record, the ALJ could

have re-contacted medical sources if the evidence received from the treating physician or other medical sources was inadequate to determine disability and additional information was needed to reach a determination.  20 C.F.R. § 404.1512(e).

Since there was little to no evidence in the record to determine Hopper's RFC properly, the ALJ should at least have attempted to contact Hopper's treating physicians, Drs. Fish and Krawchenko.[18]  Additionally, the ALJ could have employed a state agency medical consultant rather than a disability analyst to render an assessment of Hopper's RFC.  The record reveals that the ALJ made no such attempt to obtain the opinions of any treating physicians or other medical sources by way of letters requesting the information nor by subpoena.  See Gray v. Astrue, No. 04 Civ. 3736(KMW)(JCF), 2007 WL 2874049, at *6-7 (S.D.N.Y. Oct. 3, 2007) (remanding because the ALJ failed to develop the record properly when the treating physician responded that he could not complete a questionnaire sent by the ALJ and the ALJ did not provide more time to the physician to gather information); Suriel v. Comm'r of Soc. Sec., No. CV-05-1218(FB), 2006 WL 2516429, at *5-6 (E.D.N.Y. Aug. 29, 2006) (remanding for failing to develop the record fully); Rosado v. Barnhart, 290 F. Supp. 2d 431, 440-41 (S.D.N.Y. 2003) (remanding for ALJ's failure to fulfill duty to fill in gaps in the record); Rosa v. Apfel, No. 97 Civ. 5831(HB), 1998 WL 437172, at *4 (S.D.N.Y. July 31, 1998) (remanding because the ALJ failed to follow-up on a request to receive a functional assessment).  Thus, the ALJ failed in his duty to develop the record properly and determine Hopper's RFC.

─────────────────────

[18]Even though the Appeals Council received a detailed medical source statement from Dr. Krawchenko subsequent to the ALJ's decision, it cannot be determined what weight it was given.  See supra n. 10.

*-22-*

Based on the errors that occurred in assessing Hopper's RFC, remand is recommend.

### D.  Subjective Complaints of Pain

Hopper contends that the ALJ's determination that Hopper's subjective complaints of pain were not entirely credible was in error.  The Commissioner contends that the ALJ properly considered Hopper's symptoms.

The basis for establishing disability includes subjective complaints of pain even where the pain is unsupported by clinical or medical findings provided that the underlying impairment can be "medically ascertained."  20 C.F.R. § 404.1529 (2005); see also Snell, 177 F.3d at 135.  A finding that a claimant suffered from disabling pain requires medical evidence of a condition that could reasonably produce such pain.  An ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be expected to be consistent with the medical and other evidence.  20 C.F.R. § 404.1529 (2003); Martone, 70 F. Supp. 2d at 150.  Pain is a subjective concept  "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  "The ALJ must discuss his resolution of the claimant's credibility regarding pain in a narrative discussion that provides specific reasons for the weight that he assigned to the claimant's statements; he may not merely conclude that the claimant's statements are not credible."  Lewis v. Apfel, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment.  See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1978); Lewis, 62 F. Supp. 2d at 653.  If there is conflicting evidence about a claimant's pain where the degree of pain complained of is not consistent with the impairment, the ALJ must make credibility findings.  Donato v. Sec'y of HHS, 721 F.2d 414, 418-19 (2d Cir. 1983).  The ALJ must consider several factors pursuant to 20 C.F.R. § 404.1529(c)(3):

> (I)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3) (2005).

Here, the ALJ concluded that Hopper's "alleged symptoms could reasonably have been caused by his C6-7 herniated nucleus polposus and lumbar degenerative disease, aggravated to some extent by obesity."  T. 19.  However, the ALJ found that Hopper's

allegations of disabling symptoms and limitations were not entirely credible because the medical evidence and his testimony demonstrated that he was capable of engaging in a wide range of activities despite his impairments.  Id.  In support of his conclusion, the ALJ noted that Hopper testified that he could perform daily functions such as driving, shopping for groceries, cooking, cleaning, doing the laundry, and doing dishes.  T. 225, 231, 237-40.  Hopper also testified that he could ride a lawn mower, take care of his personal needs, watch television for six hours a day, read for a half-hour to a few hours a day, lift ten pounds, bend over, reach overhead, use his hands and arms to push and pull, climb a flight of stairs, tie his shoes, and operate snaps and safety pins.  T. 231-32, 237-40.  The ALJ additionally noted that Hopper played nine holes of golf every week, he purchased an annual golf membership, and he either walked or used a cart on the golf course.  T. 19, 235-37.  Further, the ALJ referred to clinical findings by Drs. Krawchenko and Tiersten that showed only mild discomfort and slight weakness in the left upper extremity.  See T. 19, 128, 132, 137-38, 161, 206.  The medical evidence also contained reports of examinations that revealed near normal findings.[19]  T.  117-22, 151-56, 208.  Thus, there is substantial evidence to support the ALJ's conclusion that Hopper's subjective complaints of pain were not entirely credible.

Therefore, it is recommended that the Commissioner's determination on this ground be affirmed.

_____

[19]Hopper also testified that he had no side effects from his medications.  T. 249.

## VI.  Remand or Reversal

A reviewing court has the authority to reverse with or without remand. 42 U.S.C. §§ 405(g), 1383(c)(3) (2003).  Remand is appropriate where there are gaps in the record or further development of the evidence is needed.  Curry, 209 F.3d at 124.  Reversal is appropriate, however, where there is "persuasive proof of disability" in the record and remand for further evidentiary development would not serve any purpose.  Id.; see also Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).  Here, there are gaps in the record, further development of the evidence is needed, and there is no incontrovertible proof of disability.  Accordingly, it is recommended that the decision of the Commissioner be remanded for further proceedings rather than reversed.

## VII.  Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that the decision denying disability benefits be **REMANDED** for further proceedings as described above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993) (citing Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Date:   February 22, 2008
        Albany, New York

David R. Homer
United States Magistrate Judge

*-26-*